R.J. REYNOLDS TOBACCO COMPANY; R.J. Reynolds Smoke Shop, Inc.; and Lorillard Tobacco Company, Plaintiffs,

v.

Diana M. BONTA, Director of the California Department of Health Services; and Dileep G. Bal, Acting Chief of the Tobacco Control Section of the California Department of Health Services, Defendants.

No. CIV. S–03–659 LKK/GGH.

United States District Court, E.D. California.

July 24, 2003.

H. Joseph Escher, III, Todd E. Thompson, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, San Francisco, CA, for plaintiffs R.J. Reynolds Tobacco Co. and R.J. Reynolds Smoke Shop, Inc.

Shannon L. Spangler, Shook, Hardy & Bacon, San Francisco, CA, for plaintiff Lorillard Tobacco Company.

Margarita Altamirano, Karen Leaf, Deputy Attorneys General, California Department of Justice Office of the Attorney General, Sacramento, CA, for defendants Bonta and Bal.

*ORDER*

KARLTON, Senior District Judge.

Two tobacco companies bring suit against officials of California's Department of Health Services. They challenge the state's anti-tobacco advertisements, which are funded through a special surtax on wholesale tobacco sales. The tobacco companies claim that the surtax forces them to fund ads with which they disagree, and that this violates their right to free speech under the First Amendment. They also complain that the ads interfere with their right to trial by jury under the Seventh Amendment and unfairly stigmatize them in violation of the Due Process Clause of the Fourteenth Amendment.

The tobacco companies have moved for a preliminary injunction and the state has moved to dismiss the complaint. I decide the matter on the basis of the papers and pleadings filed herein, and after oral argument.[1]

## I.

## BACKGROUND [2]

### A. PROPOSITION 99: THE TOBACCO TAX AND HEALTH PROTECTION ACT

In 1988, the voters of California approved Proposition 99, a statewide ballot initiative also known as the "Tobacco Tax and Health Protection Act of 1988" ("the

---

1. In addition to unusually extensive and competent briefing by the parties, the court has also had the benefit of briefing by the *amici* American Cancer Society, American Heart Association and American Lung Association.

2. Because this case is before the court on defendants' motion to dismiss, the factual summary assumes the truth of all of the allegations set forth in plaintiffs' First Amended Complaint. I do not here consider the factual showing required for obtaining injunctive re-

lief, since "the irreducible minimum" for such relief is "a fair chance of success on the merits." *Benda v. Grand Lodge of Int'l Machinists*, 584 F.2d 308, 314 (9th Cir.1978). Thus, if the motion to dismiss prevails, the court will have no occasion to consider the plaintiffs' motion. I have, however, on occasion considered the contents of affidavits filed in support of plaintiffs' motion, where they tender details concerning the facts alleged in the complaint.

Act").[3] Cal. Rev. & Tax Code §§ 30121–30130. The Act imposes a $0.25 per-pack surtax on all wholesale cigarette sales in California known as the Cigarette and Tobacco Products Surtax ("the Surtax").

### 1. The Cigarette and Tobacco Products Surtax

The revenue collected by the Surtax is placed in the "Cigarette and Tobacco Products Surtax Fund" and may be appropriated only for the following purposes: (1) tobacco-related school and community health education programs; (2) tobacco-related disease research; (3) medical care for patients who cannot afford to pay and who lack health insurance; and (4) programs for fire prevention and environmental conservation. *Id.,* § 30122(a). In accordance with these purposes, taxes deposited into the Surtax Fund are allocated, according to specified percentages, among six separate accounts: Health Education (20%), Hospital Services (35%), Physician Services (10%), Research (5%), Public Resources (5%), and an Unallocated Account (25%), which may be made available for any of the four purposes specified above. *Id.,* § 30124(b)(1). The tobacco advertising program at issue in this case is funded through a portion of the Health Education Account, which "shall only be available for the prevention and reduction of tobacco use, primarily among children, through school and community health programs." *Id.,* § 30122(b)(1).

### 2. The Tobacco Control Program

In 1999, the Legislature adopted implementing legislation. Cal. Health & Safety Code §§ 104350–104485. In conjunction therewith, the Legislature made findings that smoking is detrimental to the health of Californians, that it results in huge costs to the state, and that prevention is the best means of addressing these concerns.[4] The Legislature also determined that tobacco use prevention and cessation is "the highest priority in disease prevention for the State of California" and made a commitment to "play a leading role in promoting a smoke-free society by the year 2000...." *Id.,* § 104350(a)(9), (10).[5]

> California spends five billion six hundred million dollars ($5,600,000,000) a year in direct and indirect costs on smoking-related illnesses.
> The elimination of smoking is the number one weapon against four of the five leading causes of death in California.
> *Id.* § 104350(a)(1), (7) & (8).

---

**3.** *See generally* Michael P. Traynor and Stanton A. Glantz, *California's Tobacco Tax Initiative: The Development and Passage of Proposition 99,* 21 J. Health Pol'y & L. 543 (1996); Edith D. Balbach, et al., *The Implementation of California's Tobacco Tax Initiative: The Critical Role of Outsider Strategies in Protecting Proposition 99,* 25 J. Health Pol'y & L. 689 (2000). The history of Proposition 99 has been one of intense legislative and legal conflict. *See, e.g., American Lung Ass'n v. Wilson,* 51 Cal.App.4th 743, 59 Cal.Rptr.2d 428 (Cal. Ct.App.1996); *Kennedy Wholesale, Inc. v. State Bd. of Equalization,* 53 Cal.3d 245, 279 Cal.Rptr. 325, 806 P.2d 1360 (Cal.1991).

**4.** The legislature specifically found that:
Smoking is the single most important source of preventable disease and premature death in California.
Tobacco-related disease places a tremendous financial burden upon persons with the disease, their families, the health care delivery system, and society as a whole.

**5.** While California is certainly not "smoke-free," there is substantial evidence, including published medical studies, indicating that the Proposition 99 programs, and the media campaign in particular, have been successful in achieving their goals. *See* C. Fichtenberg and S. Glantz, *Association of the California Tobacco Control Program with Declines in Cigarette Consumption and Mortality from Heart Disease,* New England Journal of Medicine 343:24, 1772–1777 (2000); M. Siegel, *Mass Media Antismoking Campaigns: A Powerful Tool for Health Promotion,* Annals of Internal Medicine, 129:2, 128–132 (1998); J.P. Pierce,

The Legislature directed the Department of Health Services to establish "a program on tobacco use and health to reduce tobacco use in California by conducting health education interventions and behavior change programs at the state level, in the community, and other nonschool settings." *Id.*, § 104375(a). Pursuant to this program, known as the Tobacco Control Program, the Department is required, *inter alia*, to develop a media campaign directed to raising public awareness of the deleterious effects of smoking and to effect a reduction in tobacco use. *Id.*, §§ 104375(b), (c), (e)(1) & (j); 104385(a); 104400.

Approximately two-thirds of the funds in the Health Education Account are allocated to the Department of Health Services for tobacco control activities. Plaintiffs allege that the state spends approximately $25 million annually on the challenged advertisements. Complaint at ¶ 22.

## B. THE CHALLENGED ADVERTISE-MENTS

California's anti-tobacco media campaign consists of radio, television, billboard and print advertising. Complaint at ¶ 14. According to plaintiffs, the ads consistently portray smoking as dangerous and undesirable and the tobacco industry and its executives as deceptive. *Id.* at ¶¶ 17, 19. In several of the television ads, actors playing tobacco executives are shown discussing how to lure more people into smoking or are portrayed as being elusive about smoking's health effects. *See* Declaration of Todd Thompson ("Thompson Decl."), Exh. L. These ads do not contain disclaimers explaining that the people shown are actors rather than actual tobacco company employees. Complaint at ¶ 18.

A recent round of television commercials features an actor playing a public relations executive for the fictional cigarette brand "Hampton," detailing for viewers his unseemly methods for getting people to start smoking. Thompson Decl., Exh. L. The ads end with the tagline, "Do You Smell Smoke?," *id.*, implicitly referencing both cigarette smoke and a smoke-and-mirrors marketing strategy. Another ad portrays tobacco executives discussing how to replace a customer base that is dying at the rate of 1,100 users a day. *Id.* Some of the ads end with images of mock warning labels such as: "WARNING: The tobacco industry is not your friend."; or "WARNING: Some people will say anything to sell cigarettes." *Id.*

Several spots suggest that tobacco companies aggressively market to children. *Id.* In one particularly striking television ad entitled "Rain," children in a schoolyard are shown looking up while cigarettes rain down on them from the sky. Complaint at ¶ 19. A voice-over states "We have to sell cigarettes to your kids. We need half a million new smokers a year just to stay in business. So we advertise near schools, at candy counters. We lower our prices. We have to. It's nothing personal. You understand." Thompson Decl., Exhibit L. At the conclusion, the narrator says, "The tobacco industry: how low will they go to make a profit?" *Id.*

Each of the challenged advertisements is identified as "Sponsored by the California Department of Health Services." *Id.*

## C. THE PARTIES

Plaintiffs are R.J. Reynolds Tobacco Company, its subsidiary, R.J. Reynolds Smoke Shop, Inc., and Lorillard Tobacco Company. Both R.J. Reynolds and Loril-

et al, *Has the California Tobacco Control Program reduced smoking?*, *Journal of the American Medical Ass'n*, 280:10, 893–899.

lard manufacture and sell cigarettes in California. All three corporations have their principal place of business in North Carolina and are incorporated in Delaware.

Lorillard and R.J. Reynolds allege that their business in California requires them to pay the Cigarette and Tobacco Products Surtax; R.J. Reynolds does not pay the Surtax directly but pays it through the Smoke Shop subsidiary. Because the Surtax is imposed on "distributors" of cigarettes, most Surtax payments are not made by the cigarette manufacturers themselves, but by cigarette wholesalers. Because plaintiffs also sell or provide small quantities of cigarettes directly to smokers in California, however, they claim that they have and will in the future be required to pay the Surtax. *See* Declaration of Steven F. Gentry ("Gentry Decl.") ¶¶ 2, 4. Plaintiffs state that their combined payments of the Tobacco Products Surtax in 2002 were in excess of $14,000. Gentry Decl. ¶ 4. Thus, plaintiffs allege that they collectively contributed approximately $2,800 of the $25 million spent on the challenged ads.

The defendants are Diana M. Bonta, Director of the California Department of Health Services, and Dileep G. Bal, Acting Chief of the Tobacco Control Section of DHS. The Complaint alleges that "Bonta is the highest-ranking official of DHS and, accordingly, is ultimately responsible for the advertising challenged in this action." Complaint at 2, ¶ 4. Defendant "Bal is directly responsible for the design, approval and distribution of the advertising challenged in this action." *Id.* at 2, ¶ 5.

## D. PLAINTIFFS' ALLEGATIONS

Plaintiffs bring five causes of action. First, they allege that the use of the Surtax for funding anti-industry ads violates the right of free speech secured to them by the First Amendment. Second, they allege an identical claim under the free speech clause of Article I, section 2 of the California Constitution. Third, plaintiffs allege that the "anti-industry" ads stigmatize them, publicly disparage their reputation and character, and prejudice potential jurors with respect to the facts that underlie the sort of civil lawsuits that are frequently brought against them in California. They allege that the distribution of the advertisements thus constitutes a denial of due process, in that the state has publicly stigmatized them and denied them the right to a fair and impartial jury in California, in violation of both the Fourteenth and Seventh Amendments. Fourth, plaintiffs allege that the distribution of the program's anti-industry ads constitutes a denial of their right to a fair and impartial jury under the Seventh Amendment. Fifth, plaintiffs bring a claim for declaratory relief, seeking a judicial declaration that the distribution of the anti-industry ads violates their constitutional rights because it (1) constitutes compelled speech with which they disagree; (2) constitutes disparaging speech which was published without affording them prior notice and hearing; and (3) has the potential to prejudice current and future California jurors with respect to matters at issue in pending litigation. Plaintiffs also seek an injunction barring defendants from using funds raised by the Surtax to distribute any advertising that "attacks, ridicules, vilifies, or otherwise criticizes or comments negatively upon the conduct or speech of the 'tobacco industry,' or of Plaintiffs." Complaint at 14 ¶ 1.

## II.

## STANDARDS UNDER FED. R. CIV. P. 12(b)(6)

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92

S.Ct. 1079, 31 L.Ed.2d 263 (1972). The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn*, 373 U.S. 746, 753 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). Thus, the plaintiff need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged. *See id.; see also Wheeldin v. Wheeler*, 373 U.S. 647, 648, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963) (inferring fact from allegations of complaint).

In general, the complaint is construed favorably to the pleader. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). So construed, the court may not dismiss the complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him or her to relief. *See Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In spite of the deference the court is bound to pay to the plaintiff's allegations, however, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

## III.

## STANDING

The defendants' first defense is that the plaintiffs lack standing. As I now explain, plaintiffs' constitutional claims are such that this suit comes close to being "in the class of those cases where standing and the merits are inextricably intertwined." *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 243 n. 5, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983).

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of Earth, Inc. v. Laidlaw Environmental Services*, 528 U.S. 167, 180–181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). These requirements together constitute the "irreducible constitutional minimum" of standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351, (1992). The party invoking federal jurisdiction bears the burden of establishing these elements. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130 (internal citations and quotation marks omitted).

## A. INJURY–IN–FACT

Plaintiffs claim they are injured because they are compelled to fund speech with which they disagree and because the airing of the challenged advertisements injures their reputation. Defendants contend that plaintiffs lack the requisite injury because their stake as taxpayers is too generalized and indirect to confer standing and because the compelled-speech claim fails as a matter of law. Defendants also

argue that plaintiffs cannot premise standing on alleged reputational injury because any such injury is not sufficiently individualized.

Generally, suits premised solely on state or federal taxpayer status are not cognizable in the federal courts because a taxpayer's "interest in the moneys of the Treasury ... is shared with millions of others, is comparatively minute and indeterminable; and the effect upon future taxation, of any payments out of the funds, so remote, fluctuating and uncertain, that no basis is afforded for [judicial intervention.]" *AS-ARCO, Inc. v. Kadish,* 490 U.S. 605, 613, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989) (quoting *Frothingham v. Mellon,* 262 U.S. 447, 487, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)). The Supreme Court, however, has indicated that standing may exist where the "peculiar relation" of the taxpayer and the taxing entity or program makes the taxpayer's interest in the application of revenues "direct and immediate." *Id.*

In the matter-at-bar, it appears that plaintiffs have such a "direct and immediate" interest. The Surtax in question is levied only on tobacco wholesalers and manufacturers, for purposes directly related to their business, so that the interest at issue is not "shared with millions of others." Both the Supreme Court and the Ninth Circuit have indicated that standing is proper where, as here, a tax is challenged by members of a small, discrete group on whom the tax is imposed. *See Bacchus Imports v. Dias,* 468 U.S. 263, 267, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (liquor wholesalers had standing to challenge constitutionality of liquor excise tax); *United States v. Butler,* 297 U.S. 1, 61, 56 S.Ct. 312, 80 L.Ed. 477 (1936) (farmers had standing to challenge agricultural processing taxes); *ACF Indus., Inc. v. California State Bd. of Equalization,* 42 F.3d 1286, 1291 (9th Cir.1994) (holding that where a state "directly assesses [plaintiffs] with the challenged tax ... the standing issue is not complex.").[6]

The plaintiffs, however, are not challenging the tax itself but the government's use of tax dollars. The question is whether the distinction makes a difference; I conclude that it does not. Standing in the present context turns on whether the plaintiffs are members of a small, discrete group on whom the tax is imposed and whether the tax is put to uses directly affecting the plaintiffs. Under this standard, there appears to be no meaningful distinction between attacking the lawfulness of collecting the tax, as contrasted with the lawfulness of the use to which the tax is put. As I now explain, the issue here is similar to taxpayer standing in another First Amendment context.

In Establishment Clause cases, rather than requiring a "direct injury," courts require a plaintiff to demonstrate a logical link between his taxpayer status and the challenged legislative enactment, and a nexus between his taxpayer status and the precise nature of the alleged constitutional infringement. *Flast v. Cohen,* 392 U.S. 83, 102–03, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *see also Doe v. Madison Sch. Dist.,* 177 F.3d 789 (9th Cir.1999) (to challenge the constitutionality of a state statute on the basis of the Establishment Clause, a party must show that "tax revenues are expended on the disputed practice."). In *Flast,* the decision rested in part on the fact that the Establishment Clause is a

6. The Tax Injunction Act, 28 U.S.C. § 1343, which creates a jurisdictional bar to cases in federal court that seek to enjoin or restrain the collection of taxes under state law, is inapplicable here because plaintiffs seek only to enjoin anti-tobacco advertising funded by the tobacco Surtax, not the collection of the Surtax itself. *See Hoohuli v. Ariyoshi,* 741 F.2d 1169, 1177 (9th Cir.1984).

specific limit on the power of Congress to tax and spend. 392 U.S. at 104, 88 S.Ct. 1942.[7] If plaintiffs' theory on the merits of their First Amendment claim is correct—i.e. that the *Abood* line of compelled expressive association cases may be extended to cover tax-funded government speech—then it would appear to follow that the Free Speech Clause would also satisfy *Flast*, since in that limited context the Free Speech Clause would also operate as a limit on the state's power to tax and spend.

Similarly, plaintiff's alleged reputational injuries, on which their Seventh Amendment and Due Process claims depend, are not as generalized as defendants contend. In arguing to the contrary, defendants rely on *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), a case in which the Supreme Court held that the alleged harm of racial stigmatization was not sufficiently individualized to confer standing on parents of black children attending public schools who challenged IRS policies regarding the tax-exempt status of racially-discriminatory private schools. The Court explained that "[i]f the abstract stigmatic injury were cognizable, standing would extend nationwide to all members of the particular racial groups against which the Government was alleged to be discriminating by its grant of a tax exemption to a racially discriminatory school, regardless of the location of that school." *Id.* at 755–56, 104 S.Ct. 3315 (internal citations and quotation marks omitted). Whatever the strength of *Allen's* logic,[8] the situation here is entirely different. The stigma and

reputational harm allegedly caused by the challenged advertisements affects only tobacco wholesalers and a handful of large tobacco manufacturers that sell their cigarettes to Californians. Thus, plaintiffs have sufficiently alleged injury.

**B. CAUSATION**

In arguing that plaintiffs have failed to demonstrate the requisite causation, defendants again raise arguments that are more properly directed to the merits. Defendants' causation argument is particularly directed to the merits of plaintiffs' Seventh Amendment claim; they claim that any impact on jury trials caused by the challenged program is entirely speculative. For purposes of the standing inquiry, at least on a motion to dismiss, plaintiffs would appear to have satisfactorily alleged that California's advertising campaign, which has the purpose of changing people's attitudes about tobacco use and maligning the character of the tobacco industry, actually has that effect. These allegations are sufficient to show that the reputational harm alleged flows from the advertisements.

**C. REDRESSABILITY**

Finally, defendants argue that plaintiffs' claims, even if sustained, would not be redressable. As defendants correctly point out, the ordinary remedy in compelled funding for speech cases is a refund of the money used to fund the objected-to speech. Here, however, plaintiffs do not seek a refund or an order enjoining the state from collecting the Sur-

---

**7.** The Court has never declared that the Establishment Clause is the only constitutional provision that satisfies the *Flast* test for taxpayer standing; it has, however, never found any other constitutional provision that satisfies the test.

**8.** I note in passing that the observation is less than perfectly persuasive. African–Americans

are a distinct group, and if indeed the government is discriminating against the members of the group in its use of taxes, it is not clear why any member of the group should not have standing. *See generally* Gene R. Nichol, *Abusing Standing: A Comment on Allen v. Wright*, 133 *U. Pa. L.Rev.* 635, 641–49 (1985).

tax and, in any event, such a remedy would be barred by the Tax Injunction Act, 28 U.S.C. § 1343. The remedy that plaintiffs do seek, however, an injunction prohibiting the defendants from airing the objectionable advertisements, is not barred by statute and has in fact been adopted by at least one court in a compelled speech case. *See Pelts & Skins LLC v. Jenkins,* 259 F.Supp.2d 482 (M.D.La.2003) (enjoining use of funds in the Louisiana Fur and Alligator Public Education Marketing Fund for the purpose of generic alligator marketing). Whether or not the relevant law dictates such a remedy is a separate matter.

Because there appears to be no bar to the remedy plaintiffs seek, they have alleged redressability for purposes of standing.

Given all the above, the court concludes that plaintiffs' allegations satisfy Article III's "case or controversy" requirement. I now turn to the merits.

### IV.

### THE FIRST AMENDMENT

The tobacco companies argue that California's use of the Proposition 99 Surtax to fund the challenged advertising effectively compels them to fund speech with which they disagree. They assert that such compulsion violates their rights under the First Amendment.[9] They do not question the states's right to convey information to its citizens about the health risks of smoking. Rather, they object to advertising that assails the character, motives and practices of the tobacco industry and seek

to enjoin the state from airing ads fitting that description.

Defendants and *amici* contend that the advertising is speech by the government on a matter of urgent importance to the public health of its citizens, and as with any other speech by the government, the advertising is necessarily funded by tax revenues. Under the "government speech" doctrine, they argue, taxpayers do not have a right to object to such activity under the First Amendment. Before turning to the government speech doctrine, I begin by addressing the compelled speech cases on which plaintiffs rely.

### A. WHETHER THE DHS ADVERTISEMENTS ARE IMPERMISSIBLE COMPELLED SPEECH

Cases involving "compelled speech" fall into two distinct categories. The first line of authority, involving situations where the government directly compels citizens to engage in speech activity, is plainly inapplicable here. The challenged program does not, for instance, require the tobacco companies to repeat an objectionable message out of their own mouths, *see West Virginia Bd. of Ed. v. Barnette,* 319 U.S. 624, 632, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (government may not compel children, contrary to their conscience, to salute the American flag), or force them to use their own property to convey an antagonistic ideological message, *see Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (government may not compel motorists, contrary to their conscience, to display license plates bearing the motto "Live Free or Die").[10]

---

**9.** While there is no doubt that corporations enjoy the protection of the First Amendment, *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), the Court has not "decid[ed] whether the First Amendment's protection of corporate speech is coextensive with the protection it affords to individuals." *McIntyre v. Ohio Elections Commission,* 514

U.S. 334, 353, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995).

**10.** While the plaintiffs object to the use of "their" tax money to fund the advertisements, they do not contend (nor could they, given the undisputed propriety of imposing the tax),

Instead, plaintiffs rely on a second line of cases in which the Supreme Court has scrutinized programs that compel people to join and contribute to groups or associations whose speech they find objectionable. *See Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977); *Keller v. State Bar of California*, 496 U.S. 1, 110 S.Ct. 2228, 110 L.Ed.2d 1 (1990); *Glickman v. Wileman Brothers*, 521 U.S. 457, 117 S.Ct. 2130, 138 L.Ed.2d 585 (1997); *United States v. United Foods*, 533 U.S. 405, 413, 121 S.Ct. 2334, 150 L.Ed.2d 438 (2001) ("[T]he mandated support is contrary to the First Amendment principles set forth in cases involving expression by groups which include persons who object to the speech, but who, nevertheless, must remain members of the group by law or necessity.").[11]

As I explain below, plaintiffs' reliance on these cases is unwarranted. Neither the holdings nor the reasoning in these cases suggest that government's decision to levy a targeted tax used to fund its own speech runs afoul of the First Amendment; moreover, so far as this court can determine, no lower court, state or federal, has found otherwise. This is not surprising. *Cf. National Ass'n for Advancement of Colored People v. Hunt*, 891 F.2d 1555, 1566 (11th Cir.1990) ("*Abood* has never been applied to the government, however; if it were, taxation would become impossible."). Put directly, the courts have consistently drawn a line between the compelled payment of funds to support private expressive association, which may be unconstitutional "compelled speech," and the compelled payment of taxes and other exactions to fund speech by the government itself. Questions arising under the latter scenario must be considered under the government speech doctrine. The Supreme Court cases on which plaintiffs principally rely serve to illustrate this distinction.

### 1. *Abood and Keller*

Chronologically, the first such case is *Abood*.[12] There, public school teachers in Detroit challenged the "agency shop" provisions of their collective bargaining agreement, which required every teacher represented by the teachers' union, regardless of whether the teacher was a member, to pay a service fee equal to union dues. 431 U.S. at 210, 97 S.Ct. 1782. The Court held that although being required to help finance the union "might well be thought ... to interfere in some way with an employee's freedom to associate for the advancement of ideas, or to refrain from doing so," any such interference was constitutionally justified by the important contribution of agency shops to the system of labor relations established by Congress. *Id.* at 222–232, 97 S.Ct. 1782. When it

---

that funds so raised are not the State's at the time the funds are expended.

**11.** I have previously described this line of cases as articulating a "doctrine of unwilling allegiance." *Prescott v. County of El Dorado*, 915 F.Supp. 1080, 1085 (E.D.Cal.1996). I have also noted my sense that this line of cases does not fit easily within the conventional pattern of First Amendment issues. *Id.* at 1085 n. 5.

**12.** In their opening brief, plaintiffs propose that "[t]he compelled speech doctrine was first applied in *International Ass'n of Machin-*

*ists v. Street*, 367 U.S. 740, 768–69, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), in which the Court held that when employees are required by law to pay dues to a labor union, the union cannot use those dues to support political activities the employees oppose." Pl's MPA in Supp. of Prelim. Inj. at 13. While this statement of the holding in *Street* is accurate, that holding was dictated by the Court's interpretation of the Railway Labor Act, not by a conclusion that the challenged policy violated the First Amendment. 367 U.S. at 768, 81 S.Ct. 1784. In any event, *Abood* made clear that the First Amendment dictates the same result.

came to the union's use of service fees for political activities unrelated to collective bargaining, however, the Court reached a different conclusion; using the fees for such purposes, the Court held, constituted impermissible compelled speech.

This holding was dictated by two well-established principles: first, that "the freedom of an individual to associate for the purposes of advancing beliefs and ideas is protected" by the First … Amendment, *id.* at 233, 97 S.Ct. 1782, and second, that "a government may not require an individual to relinquish rights guaranteed to him by the First Amendment as a condition of public employment." *Id.* at 234, 97 S.Ct. 1782. It followed, the Court held, that the First Amendment prohibited the union and the school board from requiring any teacher, as a condition of employment, to contribute to the advancement of ideological causes with which the teacher disagreed and which were not "germane" to the union's duties as a collective-bargaining representative. *Id.* at 235–35, 97 S.Ct. 1782. The Court carefully limited the prohibition to activity unrelated to the union's core associational purposes, distinguishing between collective bargaining activities, for which otherwise impermissible compelled association was justified, and other purposes, for which no such justification existed.

In a concurring opinion, Justice Powell emphasized that the obligation of citizens to contribute taxes to the government, whether or not they agree with how the money is spent, is not an obligation that may be excused by the freedom of speech or association. In doing so, he highlighted the critical distinction between expressive association and government speech:

Compelled support of a private association is fundamentally different from compelled support of government. Clearly, a local school board does not need to demonstrate a compelling state interest every time it spends a taxpayer's money in ways the taxpayer finds abhorrent. But the reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people. The same cannot be said of a union, which is representative only of one segment of the population, with certain common interests. The withholding of financial support is fully protected as speech in this context.

*Id.* at 259 n. 13, 97 S.Ct. 1782 (Powell, J., concurring).

In *Keller,* the Court expanded on *Abood's* compelled speech analysis and, more importantly for our purposes, on the distinction in Justice Powell's footnote. The *Keller* Court held that compelling objecting attorneys to pay dues to the California State Bar, to the extent that such dues were used to finance political or ideological activities not germane to the state bar's function, was invalid. The California Supreme Court decision under review, relying on the government speech doctrine, had rejected the attorneys' First Amendment challenge because it determined that the Bar was a government agency. In ruling against the Bar, the U.S. Supreme Court did not reject the state court's rationale. On the contrary, the Court embraced the distinction between government speech and compelled speech and merely rejected the premise that the State Bar was speaking on behalf of the government.[13] Indeed, the Court quoted the Cal-

---

**13.** The Court acknowledged that "the Supreme Court of California is the final authority on the 'governmental status' of the State Bar of California for purposes of state law" but held that the state court's "determination that the respondent is a 'government agency'

… is not binding on us when such a determination is essential to the decision of a federal question." 496 U.S. at 10, 110 S.Ct. 2228. *But see McMillian v. Monroe County, Ala-*

ifornia court's broad articulation of the doctrine, along with Justice Powell's *Abood* concurrence, apparently with approval:

> *If the bar is considered a government agency,* then the distinction between revenue derived from mandatory dues and revenue from other sources is immaterial. A government agency may use unrestricted revenue, whether derived from taxes, dues, fees, tolls, tuition, donation, or other sources, for any purposes within its authority.

*Keller,* 496 U.S. at 10, 110 S.Ct. 2228 (quoting *Keller v. State Bar,* 47 Cal.3d 1152, 1167, 255 Cal.Rptr. 542, 767 P.2d 1020 (1989)) (emphasis added).

The High Court, however, concluded that the Bar's primary purpose was the representation of its members, and thus it was functionally equivalent to the union in *Abood* and "a good deal different from most other entities that would be regarded in common parlance as 'government agencies.'" 496 U.S. at 11, 110 S.Ct. 2228. The Court clearly articulated the difference between the compelled speech at issue there and government speech, holding that "[t]he very specialized characteristics" of the Bar distinguished its role from that of government officials, who "are expected as part of the democratic process to represent and espouse the views of a majority of their constituents." *Id.*

As in *Abood,* the Court found that compelled association with the Bar was permissible to the extent that it furthered the Bar's core purposes. Just as the "agency shop" arrangement was designed to prevent free-riders (people who benefit from collective bargaining but don't pay dues), it was appropriate that "the lawyers who derive benefit" from the Bar's activities, "should be called upon to pay a fair share of the cost of professional involvement in this effort." *Id.* at 11, 110 S.Ct. 2228.

Again, as in *Abood,* to the extent that the political and ideological activities funded were not germane to that purpose, compelled association could not be justified.

### 2. *Glickman and United Foods*

Plaintiffs place greater emphasis on a pair of more recent Supreme Court decisions, *Glickman* and *United Foods,* both of which discussed the application of *Abood* and *Keller* to programs that compel agricultural producers to contribute to trade groups for the purposes of generic industry advertising. Neither of these cases, however, upset the Court's distinction between government speech and impermissible compelled speech.

In *Glickman,* the Court rejected a challenge by growers and processors of California tree fruits, who were required by marketing orders promulgated by the Secretary of Agriculture (pursuant to the Agricultural Marketing Agreement Act) to pay assessments to a Nectarine Administrative Committee and Peach Commodity Committee. Those committees, in turn, used the money to pay for generic industry advertising.

The Court began its inquiry by stating that "*Abood,* and the cases that follow it, did not announce a broad First Amendment right not to be compelled to provide financial support for any organization that conducts expressive activities. Rather, *Abood* merely recognized a First Amendment interest in not being compelled to contribute to an organization whose expressive activities conflict with one's freedom of belief." 521 U.S. at 471, 117 S.Ct. 2130. The *Glickman* Court held that the assessments at issue did not violate the First Amendment because "(1) the generic advertising of California peaches and nectarines is unquestionably germane to the

*bama,* 520 U.S. 781, 786, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997).

purposes of the marketing orders and, (2) in any event, the assessments are not used to fund ideological activities." *Id.* at 473, 117 S.Ct. 2130. Thus, as in *Abood* and *Keller*, the Court adhered to its germaneness test, holding that speech that is germane to broader, legitimate purposes of association will be upheld. As Justice Souter noted, the Court was not required to discuss the government speech doctrine because the Secretary of Agriculture expressly waived the argument that the advertisements at issue constituted government speech. *Id.* at 483 n. 2, 117 S.Ct. 2130 (Souter, J., dissenting).

Only four years later, in *United Foods*, the Court invalidated a similar federal assessment program imposed on mushroom growers. The Court distinguished the fruit-tree program upheld in *Glickman* by explaining that "[i]n *Glickman*, the mandated assessments for speech were ancillary to a more comprehensive program restricting marketing autonomy. Here, for all practical purposes, the advertising itself, far from being ancillary, is the principal object of the regulatory scheme."

*United Foods*, 533 U.S. at 415, 121 S.Ct. 2334.[14]

Notably, the Court again did not reach the question of government speech. Because the issue had not been addressed in the courts below, the Court declined to consider the argument. The Court suggested, however, that the government would have to establish that it exercised more than *pro forma* control over the speech for it "to be labeled, and sustained, as government speech." [15]

Unlike the mushroom assessment program invalidated in *United Foods*, there is no question that the DHS officials named as the defendants here exercise much more than *pro forma* authority over the challenged advertising, and plaintiffs do not suggest otherwise. The parties do not dispute that the defendants are actually responsible for the speech conveyed. Thus, there are no "difficult issues [that] would have to be addressed [before] the program [is] labeled, and sustained, as government speech." 533 U.S. at 417, 121 S.Ct. 2334.

**14.** Based on this distinction, defendants contend that, even if the speech at issue here were not government speech, the use of Tobacco Products Surtax funds for advertising would nevertheless survive constitutional scrutiny because the ads are just one part of a comprehensive regulatory scheme aimed at reducing the harmful effects of tobacco use. Because the vast majority of the funds raised by the Surtax are used to fund activities other than speech, such as health care, research and other programs, they maintain that this case would be closer to *Glickman* than *United Foods*. Assuming government speech were not involved, defendants' argument has considerable weight, since speech appears not to be "the principal object of the regulatory scheme." *United Foods*, 533 U.S. at 415, 121 S.Ct. 2334; *see Delano Farms Co. v. California Table Grape Comm'n*, 318 F.3d 895, 898 (2003) (applying *Glickman–United Foods* distinction to grape advertising program; explaining that the distinction turns on the comprehensiveness of the regulatory scheme). Since the speech involved here is government speech, neither *Glickman* nor *United Foods* control and there is therefore no need to further address the issue.

**15.** The Court explained:

The Government's failure to raise its argument in the Court of Appeals deprived respondent of the ability to address significant matters that might have been difficult points for the government. For example, although the Government asserts that the advertising is subject to approval by the Secretary of Agriculture, respondent claims that the approval is *pro forma*. This and other difficult issues would have to be addressed were the program to be labeled, and sustained, as government speech. 533 U.S. at 417, 121 S.Ct. 2334.

In *Board of Regents of the Univ. of Wisconsin v. Southworth*, 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000), as in *United Foods*, the Court made clear that when the question of whether government speech is involved is properly raised, that question presents a threshold issue in a compelled speech challenge under the *Abood* line of cases. Only after first concluding that "[t]he case we decide here ... does not raise the issue of the government's right, or to be more specific, the state-controlled University's right, to use its own funds to advance a particular message," 529 U.S. at 229, 120 S.Ct. at 1354, did the Court move on to the compelled speech inquiry, *id.* ("[t]he *Abood* and *Keller* cases, then, provide the beginning point of our analysis.").[16]

In the wake of *United Foods*, federal courts addressing challenges of mandatory assessments for generic agricultural advertising programs have uniformly addressed government speech as a threshold issue before turning to the compelled speech inquiry. *See, e.g., Pelts & Skins, LLC v. Jenkins*, No. 259 F.Supp.2d 482, 489–91 (M.D.La.2003) (challenge of mandatory assessments used to fund generic advertising of alligator products; reasoning that "because the generic advertising here involved is not government speech, plaintiff is free to challenge such advertising on First Amendment grounds"); *In re Washington State Apple Advertising Comm'n*, 257 F.Supp.2d 1290, 1305 (E.D.Wash.2003) (challenge of mandatory assessments used to fund generic advertising of apples; reaching compelled speech issue only after holding that "the Commission's activities are not protected by the government speech doctrine"); *Michigan Pork Producers v. Campaign for Family Farms*, 229 F.Supp.2d 772, 785–89 (W.D.Mich. 2002) (challenge of mandatory assessments for generic advertising of pork products; reasoning that "though the Secretary is integrally involved with the workings of the Pork Board, this involvement does not translate the advertising and marketing in question into 'government speech' "); *Livestock Mktg. Ass'n v. United States Dep't of Agric.*, 207 F.Supp.2d 992 (D.S.D. 2002) ("The generic advertising program funded by the beef checkoff is not government speech and is therefore not excepted from First Amendment challenge"); *Charter v. United States Dep't of Agric.*, 230 F.Supp.2d 1121 (D.Mont.2002) (rejecting challenge to a program of mandatory assessments for beef industry advertising on the grounds that the advertising at issue was government speech and that *United Foods*, therefore, did not control).

A recent decision by the Eighth Circuit offers a concise explanation of the difference between compelled speech and government speech:

---

**16.** The Ninth Circuit authority on which plaintiffs rely does not suggest another mode of analysis. Plaintiffs rely on *Cal–Almond, Inc. v. USDA*, 14 F.3d 429 (9th Cir.1993) ("*Cal–Almond I*"), and go so far as to suggest that the case "controls" the outcome here. *See, e.g.*, Pl's Reply Br. at 8–10. But as *Cal–Almond's* procedural history makes clear, and as the Ninth Circuit has explained, that decision's compelled speech analysis is no longer good law. *See Cal–Almond v. USDA*, 192 F.3d 1272, 1277 (1999) ("*Cal–Almond IV*") ("[I]n light of the Supreme Court's remand in *Cal–Almond II* and our subsequent remand for dismissal in *Cal–Almond III, Cal–Almond I* has been implicitly overruled."). The decision's holdings on other issues, however, retain precedential value. *See, e.g., NRDC v. Evans*, 316 F.3d 904, 906, 911–12 (9th Cir. 2003) (relying on *Cal–Almond I* for an administrative law issue; "The outcome here follows *Cal–Almond*.").

Nor does the Ninth Circuit's recent decision in *Delano Farms* help plaintiffs. *Delano Farms* simply offers a straightforward application of *United Foods* to a grape advertising program similar to the mushroom program considered by the Supreme Court.

Unlike [a case] where plaintiffs challenge[ ] a decision concerning the *content of government speech*, appellees in the present case are challenging the government's authority to compel them to support speech with which they personally disagree; such compulsion is a form of *government interference with private speech*. The two categories of First Amendment cases—government speech cases and compelled speech cases—are fundamentally different.

*Livestock Mktg. Ass'n v. United States Dep't of Agric.*, 335 F.3d 711, 719–20 (July 8, 2003). (emphasis added). Put simply, while the cases on which plaintiffs rely fall in the compelled speech line, this case involves government speech. Plaintiffs are not seeking to prevent coerced participation in private expressive association; rather, they are attempting to exercise a taxpayer's veto over speech by the government itself. As I explain below, that attempt founders on the shoals of the "government speech" doctrine.

## B. WHETHER THE DHS ADVERTISEMENTS ARE GOVERNMENT SPEECH

■ The determination as to whether speech is properly characterized as government speech or private speech turns entirely on "who is responsible for the speech." *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1011–12 (9th Cir.2000), *cert. denied*, 532 U.S. 994, 121 S.Ct. 1653, 149 L.Ed.2d 636 (2001). In other words, the inquiry rests on the level of control and authority that the government exercises over the message conveyed. *See id.* at 1009–1012 (content of public school bulletin boards was govern-

ment speech because boards were used to express school policy, access was limited to faculty and staff, and postings were subject to the oversight of school principals); *see also Knights of the Ku Klux Klan v. Curators of the Univ. of Mo.*, 203 F.3d 1085, (8th Cir.), *cert. denied*, 531 U.S. 814, 121 S.Ct. 49, 148 L.Ed.2d 18 (2000) (underwriting acknowledgments by state university-run radio station constituted government speech because, *inter alia*, radio station's staff members composed, edited and reviewed acknowledgment scripts prior to broadcast and because the university was ultimately responsible for all broadcast material).

■ While in some cases the distinction between government speech and compelled allegiance may present "difficult issues," *United Foods*, 533 U.S. at 417, 121 S.Ct. 2334, the analysis here is straightforward. The advertisements at issue here are controlled by government officials, who are ultimately responsible for their content.[17] *See* Complaint at 2, ¶ 4 (alleging that defendant Bonta "is ultimately responsible for the advertising challenged in this action"); *id.* at 2, ¶ 5 (alleging that defendant Bal "is directly responsible for the design, approval and distribution of the advertising challenged in this action."). Indeed, the Department of Health Services is specifically directed by statute to produce and implement a "media campaign ... stress[ing] the importance of both preventing the initiation of tobacco use and quitting smoking ... based on professional market-research and surveys necessary to determine the most effective method of diminishing tobacco use among specific

**17.** In contrast, the "speakers" in the compelled allegiance cases cited by the plaintiffs were the Mushroom Council (*United Foods*), the Nectarine Administrative Committee and Peach Commodity Committee (*Glickman*), the State Bar of California (*Keller*), the Detroit Federation of Teachers (*Abood*), the California Table Grape Commission (*Delano Farms*), California Almond Board (*Cal–Almond I*), and the Cattleman's Beef Promotion and Research Board (*United States v. Frame*, 885 F.2d. 1119 (3rd Cir.1989)).

target populations." Cal. Health & Saf. Code § 104375(e)(1).[18]

If the determination turned on the attribution of the speech rather than control of the message, the result here would be the same. Unlike the *Glickman–United Foods* line of cases where a discrete group is compelled to fund the "dissemination of a particular message *identified with that group,*" *Cal–Almond I,* 14 F.3d at 435 (emphasis added), the tobacco advertisements are clearly identified as coming from the California Department of Health Services, i.e. the state government. *Compare* Thompson Decl., Exhibit L (challenged advertisements are all clearly identified as "Sponsored by the California Department of Health Services") *with U.S. v. Frame,* 885 F.2d 1119, 1133 n. 11 (3d Cir.1989) (beef checkoff advertising contains "no mention of the Secretary or the Department of Agriculture, thus failing to convey that the advertisements are funded through a government program.").[19] Even if the ads were not so clearly identified, no one could possibly confuse them for the tobacco companies' own speech. This fact of attribution, together with the actual responsibility of government officials for the ads, demonstrates that the speech at issue here is government speech.

## C. THE GOVERNMENT SPEECH DOCTRINE

In discussing the latitude afforded to the government under the "government speech" doctrine, courts have generally spoken in terms that are remarkably open-ended. Given the purposes of the doctrine, a broad opportunity for government speech is not entirely inappropriate. I cannot acknowledge the doctrine, however, without also expressing my serious reservations about its undefined and open-ended nature. I begin by explaining why the government speech doctrine compels the conclusion that the challenged program must be upheld. I then turn to the potential limits on the doctrine in order to underscore that government speech, like government action, is not without constitutional limits. Nonetheless, I conclude that none of the present limitations on government speech support plaintiffs' claims.

I begin this portion of the analysis by noting that the government does not enjoy protection for its speech under the First

**18.** The same statute also provides that "[n]o media campaign funded pursuant to this article shall feature in any manner the image or voice of any elected public official or candidate for elected office, or directly represent the views of any elected public official or candidate for elected office." Cal. Health & Safety Code § 104375(e)(2). This provision in no way undermines the fact the government is directly responsible for the ads; on the contrary, it ensures that the position being advanced is that of the government itself, not of political candidates. The provision is clearly designed to ensure that tax money is not used to fund partisan political speech or electioneering.

**19.** With near unanimity, courts that have squarely addressed the issue have found that generic agricultural assessment programs, which fund speech by non-governmental or quasi-governmental industry groups for the collective benefit · of contributing producers, are not governmental speech. The "Beef Checkoff" program appears to be the only such program on which courts have been somewhat divided. *Compare Livestock Marketing,* 335 F.3d 711 (holding that beef program is not government speech; striking down program as "in all material respects, identical to the mushroom checkoff program at issue in *United Foods*"); *Goetz v. Glickman,* 149 F.3d 1131, 1138–39 (10th Cir.1998), *cert. denied,* 525 U.S. 1102, 119 S.Ct. 867, 142 L.Ed.2d 769 (1999) (upholding beef program under *Glickman*); *United States v. Frame,* 885 F.2d 1119 (3d Cir.1989) (holding beef program is not government speech and passes muster under *Central Hudson) with Charter* (beef checkoff is government speech and thus *United Foods* does not control).

Amendment. *See Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 139, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973) (Stewart, J., concurring) ("The First Amendment protects the press *from* government interference; it confers no analogous protection *on* the government"); *id.* at 139, n. 7, 93 S.Ct. 2080 (" 'The purpose of the First Amendment is to protect private expression and nothing in the guarantee precludes the government from controlling its own expression or that of its agents.' " (quoting T. Emerson, *The System of Freedom of Expression* 700 (1970))).

Nonetheless, "[t]he government speech doctrine has firm roots in our system of jurisprudence." *Livestock Marketing,* 335 F.3d 711, 719–20. The Supreme Court has said, in dicta, that "when the government appropriates public funds to promote a particular policy of its own it is entitled to say what it wishes." *Rosenberger v. Rector and Visitors of the Univ. of Virginia,* 515 U.S. at 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995); *see Columbia Broad. Sys.,* 412 U.S. at 139 & n. 7, 93 S.Ct. 2080 (Stewart, J., concurring) ("Government is not restrained by the First Amendment from controlling its own expression."). In equally broad language, the Ninth Circuit has said that when the government is the speaker, "its control of its own speech is not subject to the constraints of constitutional safeguards and forum analysis, but instead is measured by practical considerations applicable to any individuals' choice of how to convey oneself: among other things, content, timing and purpose." *Downs,* 228 F.3d at 1013.[20]

It has been said that the government speech doctrine is a necessary implication of our system of government:

> Government officials are expected as a part of the democratic process to represent and to espouse the views of a majority of their constituents. With countless advocates outside of the government seeking to influence its policy, it would be ironic if those charged with making governmental decisions were not free to speak for themselves in the process. If every citizen were to have a right to insist that no one paid by public funds express a view with which he disagreed, debate over issues of great concern to the public would be limited to those in the private sector, and the process of government as we know it radically transformed.

*Keller,* 496 U.S. at 12–13, 110 S.Ct. 2228.[21] While plaintiffs' reaction to California's advertisements is quite understandable, the government speech doctrine teaches that

---

**20.** Implicit in the government speech cases is a suggestion that government is just one more participant in the marketplace of ideas. Such a notion appears to this court to be naïve. It ignores the force of government, as compared to private speech, and, even more importantly, the access that government speech has to free media, much less the paid media at issue here.

**21.** Such broad statements appear to this court to miss the nuances that should inform the question. It is one thing to recognize that the government in a democracy must make policy choices about those issues that are properly before it, and must be able to inform the public about why those choices were made. This case appears to present quite a different

question. Here, the legislature has not made a decision about banning or even regulating the sale of tobacco products to adults, but rather seeks to persuade adults not to use tobacco products. In a sense, the path taken by Proposition 99 turns the democratic process on its head. Rather than citizens trying to persuade the government as to a proper course of its conduct, the government tries to dissuade the public from engaging in conduct it apparently does not have the political will to either regulate or ban. While these observations may well address questions of political philosophy rather than purely legal issues, they nonetheless appear appropriate, given that the entire government speech doctrine derives from political philosophy rather than a specific constitutional power.

the remedy for their assertion of harm is "political rather than judicial." *Griffin v. Secretary of Veterans Affairs,* 288 F.3d 1309, 1324–25 (Fed.Cir.2002). "[W]hen government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position." *Southworth,* 529 U.S. at 235, 120 S.Ct. 1346; *see Downs,* 228 F.3d at 1011–14 ("In order for the speaker to have the opportunity to speak as the government, the speaker must gain favor with the populace and survive the electoral process.").[22]

Here, some may think that the issue is not as problematic as government's efforts to persuade the public might be in another context. They would take comfort from the fact that the advertisements in question derive not just from some government official's choice, but are instead the result of an initiative. In a sense, then, the program represents the direct decision of the majority of those voting to attempt to convince smokers to forego that vice. In this court's view, however, those facts provide cold consolation. The issue is not whether the majority of voters approve of the program, but whether in a system of limited government, such approval should be translated into a government sponsored propaganda effort. Indeed, as I have previously noted, the fact that a statute was adopted by the initiative process "provides no special insulation from review for asserted constitutional infirmity." *Service Employees Int'l Union v. Fair Political Practices Comm.,* 747 F.Supp. 580, 583 (E.D.Cal.1990) (citing *Citizens Against*

*Rent Control v. Berkeley,* 454 U.S. 290, 295, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981)). Again, notwithstanding this court's scruples, the present state of the government speech doctrine appears to provide no basis for limiting the advertisements in issue.

Certainly, the fact that the advertisements at issue are tax-supported provides no support for plaintiffs' claims. The government's speech is necessarily paid for by citizens, some of whom—like plaintiffs here—will disagree with its message. *See Southworth,* 529 U.S. at 229, 120 S.Ct. 1346 ("It is inevitable that government will adopt and pursue programs and policies within its constitutional powers but which nevertheless are contrary to the profound beliefs and sincere convictions of some of its citizens."). The High Court has consistently taught that such disagreement is simply the cost of living in a democracy and provides no basis under the First Amendment to silence the government or to excuse objecting citizens from having to share the costs of its speech. *See Lathrop v. Donohue,* 367 U.S. 820, 857, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) (Harlan, J., concurring) ("A federal taxpayer obtains no refund if he is offended by what is put out by the United States Information Agency."); *United States v. Lee,* 455 U.S. 252, 260, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) ("The tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious belief.").

The tobacco companies argue that a crucial difference between this case and others in which the courts have applied the government speech doctrine is that, here, the

---

**22.** The assumption that a particular piece of government speech would suffice in the mind of the voting public to justify obtaining "newly elected officials" seems not just unrealistic, but also ignores the difficulty and vast costs of election campaigns in a state such as Califor-

nia. *See, e.g., California Prolife Council v. Scully,* 989 F.Supp. 1282 (E.D.Cal.1998). To say that the answer to abuse by government speech is political, frequently will simply mean that there is no answer.

state is using taxes paid by a specific industry to finance advertising that condemns that very industry. Again, one may understand the plaintiffs' discomfort, but the Supreme Court has never suggested that the government speech doctrine applies only to speech funded with general tax revenues. On the contrary, it seems clear that speech by the government is government speech, however funded. That is, given that the tax is lawfully imposed, the money collected becomes the government's to expend as it sees fit, so long as those expenditures fall within legal limits. If this were not so, the Supreme Court's discussion of and reference to the government speech doctrine in *Abood,* 431 U.S. at 259 n. 13, 97 S.Ct. 1782, *Keller,* 496 U.S. at 12–13, 110 S.Ct. 2228, *Glickman,* 521 U.S. at 473, 117 S.Ct. 2130, and *United Foods,* 533 U.S. at 417, 121 S.Ct. 2334, would have been irrelevant surplusage. Indeed, the Court has recently declared that "[t]he government, as a general rule, may support valid programs and policies by taxes or *other exactions* binding on protesting parties. Within this broader principle it seems inevitable that funds raised by the government will be spent for speech and other expression to advocate and defend its own policies." *Southworth,* 529 U.S. at 229, 120 S.Ct. 1346 (emphasis added);[23] *see also United Foods,* 533 U.S. at 425–26, 121 S.Ct. 2334 (Breyer, J., dissenting) (arguing that if contested assessments on industry constituted "a targeted tax," government could fund advertising with such a tax, which, under *Southworth,* would be "binding on protesting parties.");

*cf. Regan v. Taxation With Representation of Wash.,* 461 U.S. 540, 547, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes"); Laurence H. Tribe, *American Constitutional Law,* § 12–4 at 807 n. 14 (2d ed.1988) (observing that while a taxpayer might have standing to challenge "an earmarked tax" used to fund government speech on a political or ideological issue, "it has been assumed that the taxpayer would lose any such challenge on the merits.").

Nor does the content or subject matter of the speech at issue alter the applicability of the government speech doctrine, as it might if the speech were religious, politically partisan, defamatory or in some other way subject to legal constraints. While the precise scope of the government speech doctrine has hardly been considered, there is no doubt that modern government is called upon to deal with "innumerable subjects" on which government may be required to take a position and then explain its reasons for doing so. *National Endowment for the Arts v. Finley,* 524 U.S. 569, 598, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (Scalia, J., concurring).

As the Supreme Court has recently observed, "tobacco use, particularly among children and adolescents, poses perhaps the single most significant threat to public health in the United States." *Lorillard Tobacco v. Reilly,* 533 U.S. 525, 570, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (*quot-*

---

**23.** In *Southworth,* which concerned the constitutionality of a student activity fee that was used in part to fund student organizations engaging in political or ideological speech, the Court noted that because "[t]he University ha[d] disclaimed that the speech was its own," the case did not present the question whether the challenge could be sustained "under the principle that the government can speak for itself." *Id.* at 234–35, 120 S.Ct.

1346. The Court went on to observe that, "[i]f the challenged speech here were financed by tuition dollars and the University and its officials were responsible for the content, the case might be evaluated on the premise that the government itself is the speaker." *Id.* Thus, the Court recognized the applicability of the government speech doctrine to speech funded not from general tax revenues, but from tuition dollars.

*ing FDA v. Brown & Williamson,* 529 U.S. 120, 161, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000)); *cf. id.* at 528, 121 S.Ct. 2404 ("The governmental interest in preventing underage tobacco use is substantial, and even compelling."); *Brown & Williamson,* 529 U.S. at 162, 120 S.Ct. 1291 (Breyer, J., dissenting) ("Unregulated tobacco use causes more than 400,000 people to die each year from tobacco-related illnesses, such as cancer, respiratory illnesses, and heart disease. Indeed, tobacco products kill more people in this country every year than ... AIDS, car accidents, alcohol, homicides, illegal drugs, suicides, and fires, combined." (citations and internal quotation marks omitted)). It seems clear that the dangers of tobacco use, with its concomitant effects on public health, are matters properly to be considered by the government and, upon adopting laws or regulations concerning such use, are proper subjects for government speech.

I have noted above my discomfort as to the propriety of the government's speech where the state has not sought to directly regulate the conduct that its speech condemns. Candor requires me to recognize that many others find no such discomfort. Indeed, government advertising to combat the public health problems caused by smoking is often cited as a paradigmatic instance of permissible government speech. *See, e.g., Finley,* 524 U.S. at 610–11, 118 S.Ct. 2168 (Souter, J., dissenting) (stating that in its role as speaker, "the government is of course entitled to engage in viewpoint discrimination: if the Food and Drug Administration launches an advertising campaign on the subject of smoking, it may condemn the habit without also having to show a cowboy taking a puff on the opposite page."); Randall Bezanson and William Buss, *The Many Faces of Government Speech,* 86 *Iowa L.* Rev. 1377, 1384 (2001) ("The simplest and clearest example of government advancing a point of view is provided when a 'law' specifically adopts a program of promoting a specific message. For example, a law might create a program to assist smokers to stop smoking.").

Put directly, while I believe that government speech doctrine raises profound questions concerning the appropriate role of government in a liberal society, the fact that the activity being condemned—the sale, purchase and use of tobacco by adults—is a legal activity does not, under present doctrine, appear to preclude government from actively discouraging that activity. On the contrary, the Ninth Circuit, by which I am bound, has recently indicated that the government speech would be unrestricted even if the sale of cigarettes were not only legal, but constitutionally-protected:

> We agree with the host of other circuits that recognize that public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction.

*American Family Ass'n, Inc. v. San Francisco,* 277 F.3d 1114, 1125 (9th Cir. 2002).[24] California's decision to combat

---

**24.** One pair of commentators have asserted that:

> Speech is but one means that government must have at its disposal to conduct its affairs and to accomplish its ends. Restricting the use of tobacco, for example, might be accomplished by regulatory action that makes it sale or purchase or possession illegal. It might be accomplished by taxing the disfavored behavior or production. But the restriction might also be accomplished

> through the provision of information so that the consumer's choice will be knowing, or by direct persuasion in the form of government advertisements or by educational programs or even by subsidies for groups or organizations that speak out against tobacco use. These expressive forms of action are no less necessary or proper means, nor less practical, efficient, or effective

the problem through a strategy of education and counter-advertising, as opposed to outright prohibition, is, under present doctrine, a political and practical judgment that the state is free to make. *See Lorillard Tobacco,* 533 U.S. at 587, 121 S.Ct. 2404 ("The State's assessment of the urgency of the problem posed by tobacco is a policy judgment, and it is not this Court's place to second-guess it."); *id.* at 571, 121 S.Ct. 2404 ("To the extent that federal law and the First Amendment do not prohibit state action, States and localities remain free to combat the problem of underage tobacco use by appropriate means."). In sum, the challenged program passes constitutional muster.

### D. POTENTIAL LIMITATIONS ON GOVERNMENT SPEECH

██ Courts, including the Supreme Court and the Ninth Circuit, have framed the government speech doctrine in especially broad terms and have generally done so without discussing ways in which the Constitution, including constitutional provisions other than the First Amendment, may place substantive limits on the government's power to speak. Nonetheless, "[t]he 'government speech' doctrine is still in its formative stages, and, as yet, it is neither extensively nor finely developed." *Sons of Confederate Veterans, Inc. v. Commissioner of Virginia Dept. of Motor Vehicles,* 305 F.3d 241, 245 (4th Cir.2002) (Luttig, J., respecting denial of rehearing en banc). As the contours of the doctrine develop more fully, it is to be hoped that the courts will recognize that limitations, both constitutional and otherwise derived, constrain the government's power to speak on controversial issues. *See Livestock Marketing,* 335 F.3d 711, 719–20 ("The government speech doctrine clearly does not provide immunity for all types of First Amendment claims.") (citing *Santa Fe Independent Sch. Dist. v. Doe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (prayers at public school football games)). Although these issues have not been raised by the parties and indeed, do not alter resolution of the case at bar, I pause briefly to address some of the important limitations on government speech in order to emphasize that my conclusion regarding plaintiffs' free speech claim does not imply that the "government speech" doctrine offers a blank check for abuse.

First, and most obviously, the Establishment Clause prohibits government from using its speech to endorse religion. *See Board of Ed. of Westside Community Schools (Dist.66) v. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (O'Connor, J., concurring) ("[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect."). As the Court explained in *Lee v. Weisman,* 505 U.S. 577, 591, 112 S.Ct.

Randall Bezanson and William Buss, *The Many Faces of Government Speech,* 86 *Iowa L.Rev.* 1377, 1380 (2001).

Another commentator has explained that "[t]here are several ways of understanding government's contribution as speaker ... Government speech can serve as an avenue for the representation of citizens' higher-minded desires even when as consumers they act with perhaps lower-minded motives (the smoker who supports Surgeon General's warnings against smoking, the careless litterer who supports environmental warning cam-

paigns, etc.) ... Government can use its speech powers to alter social norms that might be difficult for people to change through private action." Abner S. Greene, *Government Speech on Unsettled Issues,* 69 *Fordham L.* Rev. 1667, 1683–84 (2001).

While my own views suggest that a more restricted role for government speech is both appropriate and more consistent with the role of government in a democracy, these comments demonstrate that others are more sanguine about the exercise of the government's enormous power to persuade.

2649, 120 L.Ed.2d 467 (1992), "[t]he First Amendment protects speech and religion by quite different mechanisms. Speech is protected by ensuring its full expression even when the government participates, for the very object of some of our most important speech is to persuade the government to adopt an idea as its own. The method for protecting freedom of worship and freedom of conscience in religious matters is quite the reverse. In religious debate or expression the government is not a prime participant, for the Framers deemed religious establishment antithetical to the freedom of all." (citations omitted).[25]

Second, the First Amendment may place other substantive limits on the government's use of speech. For instance, government speech that "drowns out" private speech may violate the First Amendment. *See National Ass'n for Advancement of Colored People v. Hunt,* 891 F.2d 1555, 1566 (11th Cir.1990) ("[T]he government may not monopolize the 'marketplace of ideas,' thus drowning out private sources of speech ... For example, the govern-

ment may not confer radio frequency monopolies on broadcasters it prefers."); *Warner Cable Communications v. City of Niceville,* 911 F.2d 634, 638 (11th Cir.1990) ("[T]he government may not speak so loudly as to make it impossible for other speakers to be heard by their audience. The government would then be preventing the speakers' access to that audience, and first amendment concerns would arise.").[26] For this reason, it is particularly important for courts to carefully distinguish between situations in which the government speaks for itself and situations in which the government creates a public forum for private speech. As Judge Luttig recently observed, it may even be that these categories will not always be mutually exclusive. *See Sons of Confederate Veterans,* 305 F.3d at 245 (Luttig, J., respecting denial of rehearing en banc).

Third, the Constitution would appear to contain a core structural principle, perhaps embodied in the Republican Form of Government Clause, that would limit the use of tax dollars to fund overtly partisan activity.[27] *See NEA v. Finley,* 524 U.S. 569,

---

**25.** Plaintiffs open their brief by invoking Thomas Jefferson's pronouncement that "to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." P. Kurland & R. Lerner, eds, *The Founders' Constitution,* vol. 5 (1987) at 77. The quoted statement is taken from Jefferson's Virginia Bill for Establishing Religious Freedom, a landmark anti-establishment measure declaring that "no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever." *Id.* It is perhaps significant that the statement arose in this context, since "the Establishment Clause is a specific prohibition on forms of state intervention in religious affairs with no precise counterpart in the speech provisions." *Lee v. Weisman,* 505 U.S. 577, 591, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

**26.** Here, of course, the "drown out" concern appears inapplicable. The tobacco industry spends much more than California does on

advertising within the state itself, even excluding national advertising expenditures that have an impact in California. In 1999/2000, the tobacco industry spent an estimated $823 Million advertising and promoting tobacco use in California, an amount that translates into $34.01 for every man, woman and child in the state. In contrast, the state's tobacco control budget for 1999/2000 was $3.42 per capita. *See* DHS, *California Tobacco Control Update* (Nov.2002).

**27.** Article IV, § 4 of the Constitution, which provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government," is generally treated as judicially unenforceable, based on a series of decisions thought to have established a *per se* rule of nonjusticiability. *See Colegrove v. Green,* 328 U.S. 549, 556, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946) ("Violation of the great guaranty of a republican form of government in States cannot be challenged in the courts."). In recent years, however, a grow-

598, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (Scalia, J., concurring) ("[I]t would be unconstitutional for the government to give money to an organization devoted to the promotion of candidates nominated by the Republican Party—but it would be just as unconstitutional for the government itself to promote candidates nominated by the Republican Party, and I do not think that that unconstitutionality has anything to do with the First Amendment."); *Lathrop v. Donohue,* 367 U.S. 820, 853, 81 S.Ct. 1826, 6 L.Ed.2d 1191 (1961) (Harlan, J., concurring in the judgment) (stating that a legislature could not constitutionally " 'create a fund to be used in helping certain political parties or groups favored' by it to elect their candidates or promote their controversial causes' ") (*quoting International Ass'n of Machinists v. Street,* 367 U.S. 740, 788, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961) (Black, J., dissenting)). One recent commentator has argued for an even broader "political anti-establishment" principle, which would prohibit a range of speech activity by the government in the sphere of election activities in a manner analogous to the Establishment Clause. *See generally Brian P. Marron, Doubting America's Sacred Duopoly: Disestablishment Theory and the Two–Party System,* 6 *Tex. F. on C.L. & C.R.* 303 (2002).[28] Such a principle might be thought to flow from Justice Jackson's eloquent statement, which remains perhaps the best encapsulation of the First Amendment's core values: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). *But see American Family Ass'n v. City and County of San Francisco,* 277 F.3d 1114, 1124 (9th Cir.2002) (holding that for the orthodoxy-of-belief prohibition to apply, there must be more than mere speech by the government; rather, there must be "actual or threatened imposition of government power or sanction."). Whatever its source, it seems clear that the Constitution places some structural limits, as yet undefined, on the ability of government officials to divert public funds for partisan speech.

Fourth, it is possible that the Due Process Clause and the Equal Protection Clause may provide substantive limitations on government speech programs where the legislative classifications do not bear a rational relationship to a legitimate state interest. *See Richardson v. City & County of Honolulu,* 124 F.3d 1150, 1162 (9th

---

ing chorus of academic critics has urged the Court to abandon the *per se* nonjusticiability rule in Guarantee Clause cases. *See* Erwin Chemerinsky, *Cases Under the Guarantee Clause Should Be Justiciable,* 65 *U. Colo. L.Rev.* 849, 850 n. 4 (1994). Recently, the Court has shown some signs of receptiveness to these arguments, and "has suggested that perhaps not all claims under the Guarantee Clause present nonjusticiable political questions." *New York v. United States,* 505 U.S. 144, 185, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (O'Connor, J.) (declining to decide the issue); *see Reynolds v. Sims,* 377 U.S. 533, 582, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("*[s]ome questions* raised under the Guarantee Clause are nonjusticiable").

**28.** This article is a recent revival of an argument advanced in the earlier work of two scholars, both of whom argued for broad limitations on government speech. *See* Mark G. Yudof, *When Government Speaks* (1983); Robert D. Kamenshine, *The First Amendment's Implied Political Establishment Clause,* 67 *Cal. L.Rev.* 1104 (1979). These broad arguments have gained few adherents among commentators, however, and even its chief proponents appear to have recognized that the theory is out of step with current jurisprudence. *See* Robert D. Kamenshine, *Reflections on Coerced Expression,* 34 *Land & Water L.Rev.* 101 (1999).

Cir.1997).[29] Imagine a situation in which a state legislature, under the influence of a powerful dairy industry, decides to tax the margarine industry and use the money for baseless ads attacking the industry. Such a scheme, it seems, would not hold up to constitutional scrutiny. "[P]rotecting a discrete interest group from economic competition is not a legitimate governmental purpose." *See Craigmiles v. Giles,* 312 F.3d 220 (6th Cir.2002) (rejecting proffered health and safety justifications and holding that a state's prohibition on the sale of caskets by anyone not licensed as a funeral director violated due process and equal protection clauses); *see City of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978) (holding, in dormant commerce clause context, that "where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected.").

Finally, the Constitution places substantial limits on the government's ability to use its speech to interfere with or punish constitutionally-protected activity. As a general rule, of course, the Supreme Court's "unconstitutional conditions" jurisprudence has said that the state may exercise its power to spend in order to discourage protected activity. *See, e.g., Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (holding that the government "may make a value judgment favoring childbirth over abortion, and ... implement that judgment by the allocation of public funds."). Perhaps the most extreme (and extremely controversial) application of this principle was *Rust v. Sullivan,* 500 U.S. 173, 192–93, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991), which sustained a prohibition on abortion-related advice by recipients of federal funds designated for family-planning counseling.[30] But even there, the Court was careful to emphasize the difference between discouragement and coercion:

> A refusal to fund protected activity, without more, cannot be equated with the imposition of a *'penalty'* on that activity. There is a basic difference between *direct state interference* with a protected activity and state encouragement of alternative activity consonant with legislative policy.

**29.** Some have also suggested that government speech with discriminatory content would be barred by equal protection or anti-endorsement principles. *See, e.g.,* James Forman, Note, *Driving Dixie Down: Removing the Confederate Flag from the Southern State Capitols,* 101 *Yale. L.J.* 505 (1991) (arguing that the Southern states' flying of the Confederate Flag "constitutes government endorsement of discrimination by private parties" and is therefore unconstitutional); *cf. American Family Ass'n,* 277 F.3d at 1127 (Noonan, J., dissenting) ("Suppose a city council today, in the year 2002, adopted a resolution condemning Islam because its teachings embraced the concept of a holy war and so, the resolution said, were 'directly correlated' with the bombing of the World Trade Center. Plausibly the purpose might be to discourage terror bombings. Would any reasonable, informed observer doubt that the primary effect of such an action by a city could be the expression of official hostility to the religion practiced by a billion people?").

**30.** While "*Rust* did not place explicit reliance on the [government speech rationale], when interpreting the holding in later cases [the Court has] explained *Rust* on this understanding." *Legal Servs. Corp. v. Velazquez,* 531 U.S. 533, 540, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). This explanation of *Rust's* holding, however, may be dicta. *See Brown v. California Dep't of Transp.,* 321 F.3d 1217, 1225 (9th Cir.2003) ("*Rust* addresses only the government's ability to exclude from a government-funded program speech is incompatible with the program's objectives."); *Velazquez,* 531 U.S. at 554, 121 S.Ct. 1043 (Scalia, J., dissenting) (stating that if the speech "at issue in *Rust* constituted 'government speech,' it is hard to imagine what subsidized speech would not be government speech").

500 U.S. at 193[, 111 S.Ct. 1759] (quoting *Harris v. McRae*, 448 U.S. 297, 317 n. 19[, 100 S.Ct. 2671, 65 L.Ed.2d 784] (1980); *Maher*, 432 U.S. at 475[, 97 S.Ct. 2376]) (internal quotation marks and citations omitted); *see also American Family Ass'n*, 277 F.3d at 1125 (holding that government may criticize protected activity "so long as there is no actual or threatened imposition of government power or sanction").

It is easy to imagine, however, a government speech program that goes beyond mere discouragement and crosses into constitutionally-forbidden territory. Suppose, for instance, that a state decided to levy a severely punitive per-procedure tax on doctors who perform abortions and directed that the revenue thereby derived be used to fund an aggressive public advertising campaign designed to intimidate women seeking abortions and vilify the doctors who provide them. The government speech doctrine notwithstanding, such a program would undoubtedly constitute an impermissible "penalty" on, or an instance of "direct state interference" with, protected activity. As even the *Rust* Court implicitly acknowledged, such a program would fail constitutional scrutiny.

Plaintiffs make no claim that the advertisements at issue fall within any of the above limitations or the government speech doctrine, and it does not require extended discussion to recognize that their reticence is entirely proper. While it is likely that as the government speech doctrine develops, other limitations will be recognized, plaintiffs do not suggest any such development. Nonetheless, it is appropriate to reiterate that government is no more free to disregard constitutional and other legal norms when it speaks than when it acts.

## V.

## ARTICLE I OF THE CALIFORNIA CONSTITUTION

■ In addition to their First Amendment claim, plaintiffs' bring an identical claim under the California Constitution's free speech clause. *See* Cal. Const., Art. I, § 2. In *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), however, the Supreme Court held that "a federal suit against state officials on the basis of state law contravenes the Eleventh Amendment when … the relief sought and ordered has an impact directly on the State itself." As plaintiffs now concede, this is such a suit. Because the Eleventh Amendment operates as a restriction on the jurisdiction of the federal courts, *see California v. Deep Sea Research, Inc.*, 523 U.S. 491, 118 S.Ct. 1464, 140 L.Ed.2d 626 (1998), plaintiffs' claim under the California Constitution must be dismissed without prejudice to it being re-filed in a court of competent jurisdiction. *See Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (1999) (reversing district court's dismissal with prejudice of state law claim barred by *Pennhurst*); *Frigard v. United States*, 862 F.2d 201, 204 (9th Cir.1988) (holding dismissals for lack of jurisdiction "should be … without prejudice so that a plaintiff may reassert his claims in a competent court").

## VI.

## SEVENTH AMENDMENT

■ The Seventh Amendment provides in relevant part: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of a trial by jury shall be preserved." U.S. Const., amend. VII. Plaintiffs' attempt to invoke this provision must fail. It is established that the right to a jury trial in civil cases

under the Seventh Amendment is not among those provisions of the Bill of Rights that have been made applicable to the states through the Fourteenth Amendment. *See Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 418, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) ("Seventh Amendment ... governs proceedings in federal court, but not in state court"); *Curtis v. Loether,* 415 U.S. 189, 192 n. 6, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974) (the Supreme Court "has not held that the right to jury trial in civil cases is an element of due process applicable to state courts through the Fourteenth Amendment"); *Walker v. Sauvinet,* 92 U.S. 90, 92, 23 L.Ed. 678 (1875) ("The States, so far as [the Fourteenth] amendment is concerned, are left to regulate trials in their own courts in their own way. A trial by jury ... is not, therefore, a privilege or immunity of national citizenship, which the States are forbidden by the Fourteenth Amendment to abridge."). Because defendants are state officials, and because the Seventh Amendment does not restrain the conduct of state officials, plaintiffs cannot maintain a Seventh Amendment claim against them.

## VII.

### THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

■ Finally, plaintiffs argue that the State's broadcast of its ads denies them due process of law. To establish a procedural due process claim, plaintiffs must first show the deprivation of a liberty or property interest protected by the Due Process Clause. *See Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "Plaintiffs all are corporations. Corporations do not have fundamental rights; they do not have liberty interests, period." *Nat'l Paint & Coatings Ass'n v. City of Chicago,* 45 F.3d 1124, 1129 (7th Cir.1995). Corporations do have property interests, however, that may be protected by procedural due process.

Here, plaintiffs allege that the challenged ads stigmatize them and publicly disparage their reputation and character. *See* Complaint at 11, ¶ 40. Allegations of injury to reputation alone, however, cannot support a claim for violation of due process, and therefore must be accompanied by a constitutionally recognized injury. *See Paul v. Davis,* 424 U.S. 693, 712, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). This rule, labeled the "stigma-plus" standard, requires a plaintiff to show that the government official's conduct deprived the plaintiff of a previously recognized property or liberty interest in addition to damaging the plaintiff's reputation. *Id.* at 712, 96 S.Ct. 1155. The rule is designed to prevent the Due Process Clause from becoming an all-purpose constitutionalization of state tort law. *Id.* at 701, 96 S.Ct. 1155. The Supreme Court has explained that an "interest in reputation is simply one of a number which the State may protect against injury by virtue of its tort law, providing a forum for vindication of those interests by means of damages actions. And any harm or injury to that interest, even where as here inflicted by an officer of the State, does not result in a deprivation of any 'liberty' or 'property' recognized by state or federal law[.]". *Id.* at 712, 96 S.Ct. 1155; *cf. Siegert v. Gilley,* 500 U.S. 226, 234, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) ("Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* action."). The Ninth Circuit has made clear that this rule is no less applicable to busi-

nesses, holding that the dissemination of a defamatory government report did not deprive a California business of "property" in its customer goodwill. *See WMX Technologies, Inc. v. Miller*, 197 F.3d 367, 376 (9th Cir.1999)(en banc).

Plaintiffs' attempts to satisfy the "plus" element of the "stigma-plus" requirement essentially by re-alleging that they have been deprived of their Seventh Amendment right to a fair trial. *See* Pls.' Reply Br. at 17–18. In proceeding this way, plaintiffs' third cause of action (due process) depends necessarily on the resolution of their fourth cause of action (the Seventh Amendment). Hence, because the Seventh Amendment claim fails as a matter of law, the due process claim likewise fails.

Although plaintiffs fail to state a claim for denial of procedural due process, if the plaintiffs truly believe that the challenged advertisements are both provably false and disparaging to their business reputations, they are free to seek relief against the State of California or its officials in a defamation action under state law.[31]

## VIII.

### CONCLUSION

Plaintiffs state no claims upon which relief can be granted. Accordingly, the Court hereby ORDERS as follows:

1. Defendants' motion to dismiss is GRANTED.

2. Plaintiffs' motion for a preliminary injunction is DENIED as moot.

3. As to plaintiffs' claim under Article I of the California Constitution, the Clerk is directed to enter judgment against the plaintiffs without prejudice.

4. As to plaintiffs' claims under the First Amendment, the Seventh Amendment and the Due Process Clause of the Fourteenth Amendment, the Clerk is directed to enter judgment against the plaintiffs with prejudice.

5. The Clerk is directed to CLOSE the case.

IT IS SO ORDERED.

---

**31.** Plaintiffs' Due Process claim has other problems. To be cognizable, the claim must allege the government's stigmatizing speech is "substantially false." *Campanelli v. Bockrath*, 100 F.3d 1476, 1484 (9th Cir.1996)(citing *Codd v. Velger*, 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977)(per curiam)). Plaintiffs' allegations appear insufficient in that regard. I do not rely on that ground, since it is susceptible to cure by amended pleading.